**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

STATE OF OKLAHOMA, EX REL.,
MIKE HUNTER,
*Plaintiff-Appellee*,

*v.*

MCKESSON CORPORATION,
*Defendant-Appellant*.

*On Appeal from the United States District Court*
*for the Eastern District of Oklahoma*

No. 6:20-cv-00172-RAW
Honorable Ronald A. White

**BRIEF OF DEFENDANT-APPELLANT**
**MCKESSON CORPORATION**

Beth S. Brinkmann
Timothy C. Hester
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: 202-662-6000

Raymond G. Lu
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: 424-332-4800

Stuart D. Campbell
DOERNER, SAUNDERS, DANIEL
& ANDERSON, L.L.P.
700 Williams Center Tower II
Two West Second Street
Tulsa, Oklahoma 74103-3522
Telephone: 918-582-1211

Kaylee Davis-Maddy
DOERNER, SAUNDERS, DANIEL
& ANDERSON, L.L.P.
210 Park Avenue, Suite 1200
Oklahoma City, OK 73102
Telephone: 405-319-3513

## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellant McKesson Corporation has no parent corporation, and no publicly held company owns 10 percent or more of its stock.

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................................ 1

STATEMENT OF JURISDICTION .......................................................... 1

STATEMENT OF THE ISSUE .................................................................. 2

STATEMENT OF THE CASE .................................................................. 3

    A.    STATEMENT OF FACTS .................................................. 5

        1.    The Federal Government's Direction of McKesson's Distribution of Prescription Medications to Federal Healthcare Providers in Oklahoma. ........................................... 5

        2.    The Detailed Provisions of the Federal Pharmaceutical Prime Vendor (PPV) Contract and Role of the Contracting Officer. .................................................. 7

        3.    The Significant Portion of the Allegedly Excessive Amount of Prescription Opioids Covered By Federal PPV Contract Distribution. ........................................... 9

    B.    PROCEEDINGS BELOW ................................................ 9

        1.    The State's Suit Against McKesson .......................... 9

        2.    Removal to Federal Court and the District Court's Remand Order ........................................................ 11

STANDARD OF REVIEW ..................................................................... 13

SUMMARY OF ARGUMENT ............................................................... 13

ARGUMENT ........................................................................................... 16

    THE DISTRICT COURT ERRED IN REMANDING THE CASE TO STATE COURT BASED ON ITS INCORRECT VIEW THAT THE FEDERAL OFFICER REMOVAL STATUTE WAS NOT SATISFIED. ............................................................................. 16

A.  McKesson Acted under the Direction of A Federal Officer
    When It Distributed Prescription Opioids to Federal Entities in
    Oklahoma. ........................................................................... 18

    1.  McKesson Assisted the Government in Fulfilling A Basic
        Task That the Government Otherwise Would Have
        Performed. ................................................................... 19

    2.  McKesson Acted Under the Guidance and Control Of the
        Federal PPV Contract and Contracting Officer. ...................... 23

B.  The State's Claims Relate to McKesson's Acts under Direction
    of a Federal Officer. ............................................................ 29

    1.  The State's Claims Relate to McKesson's Distribution of
        Opioids under the Federal PPV Contract. ................................ 30

    2.  The State's Purported Disavowal Cannot Override the
        Relationship between Its Claims and McKesson's
        Federally-Controlled Distribution. ........................................... 33

        a)  The State's allegations of causation and injury as
            specifically pled put at issue *all* opioids distributed
            by McKesson in Oklahoma, including under the
            federal contract. ............................................................. 34

        b)  The State's purported disavowal would require
            premature resolution of issues of injury and
            causation that should be resolved on the merits in
            federal court, consistent with the purpose of the
            federal officer statute. ..................................................... 36

C.  McKesson Has Colorable Federal Defenses to the State's Claims. ....... 41

    1.  McKesson Raised a Colorable Federal Government
        Contractor Defense. ................................................................ 42

    2.  McKesson Raised a Colorable Federal Preemption Defense. ....... 47

CONCLUSION .................................................................................. 50

REMAND ORDER OF DISTRICT COURT ........................................ 52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Manypenny*,
  451 U.S. 232 (1981)............................................................17

*In re Asbestos Prod. Liab. Litig. (No. VI)*,
  770 F.Supp.2d 736 (E.D. Pa. 2011)............................................33, 34

*Baker v. Atl. Richfield Co.*,
  421 F.Supp.3d 634, 643 (N.D. Ind. 2019), *rev'd and remanded*,
  962 F.3d 937 (7th Cir. 2020) ................................................40

*Baker v. Atlantic Richfield Co.*,
  962 F.3d 937 (7th Cir. 2020) ...........................................*passim*

*Ballenger v. Agco Corp.*,
  2007 WL 1813821 (N.D. Cal. June 22, 2007)....................................34

*Bd. of Cty. Commissioners of Boulder Cty. v. Suncor Energy (U.S.A.)*
  *Inc.*, 965 F.3d 792 (10th Cir. 2020) ..................................*passim*

*Bennett v. MIS Corp.*,
  607 F.3d 1076 (6th Cir. 2010) ...........................................22, 42

*Boyle v. United Techs. Corp.*
  487 U.S. 500 (1988).....................................................15, 42, 45

*Brown v. Plata*,
  563 U.S. 493 (2011).........................................................21

*Caver v. Cent. Ala. Elec. Coop.*,
  845 F.3d 1135 (11th Cir. 2017) ..........................................29, 47

*City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership*
  *Corp.*, 484 F.3d 380 (6th Cir. 2007) ......................................46

*Colorado Dep't of Pub. Health & Env't, Hazardous Materials &*
  *Waste Mgmt. Div. v. United States*,
  693 F.3d 1214 (10th Cir. 2012) ............................................47

v

*Crosby v. National Foreign Trade Council*,
    530 U.S. 363 (2000)............................................................................48

*Despres v. Ampco-Pittsburgh Corp.*,
    577 F.Supp.2d 604 (D. Conn. 2008)..................................................35

*Durham v. Lockheed Martin Corp.*,
    445 F.3d 1247 (9th Cir. 2006) ............................................................17

*Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776*,
    346 U.S. 485 (1953)............................................................................50

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000)............................................................................49

*Goncalves v. Rady Children's Hops. San Diego*,
    865 F.3d 1237 (9th Cir. 2017) ...............................................22, 29, 31

*Gonzalez v. Raich*,
    545 U.S. 1 (2005)................................................................................48

*Helfrich v. Blue Cross & Blue Shield Ass'n*,
    804 F.3d 1090 (10th Cir. 2015) ..............................................42, 43, 44

*Isaacson v. Dow Chem. Co.*,
    517 F.3d 129 (2d Cir. 2008) ...........................................22, 29, 39, 41

*Jefferson Cty., Ala. v. Acker*,
    527 U.S. 423 (1999)...........................................................18, 29, 40

*Johnson v. Am. Towers, LLC*,
    781 F.3d 693 (4th Cir. 2015) .............................................................47

*Latiolais v. Huntington Ingalls, Inc.*,
    951 F.3d 286 (5th Cir. 2020) (en banc) ............................29, 31, 41, 44

*Leite v. Crane Co.*,
    749 F.3d 1117 (9th Cir. 2014) ............................................................39

*Marley v. Elliot Turbomachinery Co.*,
    545 F.Supp.2d 1266 (S.D. Fla. 2008)..................................................39

*In re Nat. Prescription Opiate Litig.*,
  327 F.Supp.3d 1064 (N.D. Ohio 2018) ............................................24, 28, 32, 46

*Ripley v. Foster Wheeler LLC*,
  841 F.3d 207 (4th Cir. 2016) ...............................................................................41

*Ruppel v. CBS Corp.*,
  701 F.3d 1176 (7th Cir. 2012) ......................................................22, 44, 45, 50

*Sawyer v. Foster Wheeler LLC*,
  860 F.3d 249 (4th Cir. 2017) .........................................................18, 29, 41, 45

*Tate v. Boeing Helicopters*,
  55 F.3d 1150 (6th Cir. 1995) ...............................................................................45

*Trevino v. General Dynamics Corp.*,
  865 F.2d 1474 (5th Cir. 1989) ............................................................................45

*Watson v. Philip Morris Companies, Inc.*,
  551 U.S. 142 (2007)..........................................................................17, 18, 21, 28

*Willingham v. Morgan*,
  395 U.S. 402 (1969)........................................................................................17, 41, 50

*Winters v. Diamond Shamrock Chemical Co.*,
  149 F.3d 387 (5th. Cir. 1998) ..............................................................................28

**Statutes**

28 U.S.C. § 1441 .........................................................................................................33

28 U.S.C. § 1442 (a)(1).....................................................................................*passim*

28 U.S.C. § 1447(d) ..............................................................................................1, 13

18 U.S.C. § 4048(f)...................................................................................................21

25 U.S.C. § 1661(a)(1)..............................................................................................20

38 U.S.C. § 301(b) ...................................................................................................20

Controlled Substances Act, 21 U.S.C. § 801, *et seq*..........................................*passim*

**Other Authorities**

71 Fed. Reg. 52,716, 52,719-20 (DEA Sept. 6, 2006)..............................................48

## STATEMENT OF RELATED CASES

There are no prior or related appeals.


## STATEMENT OF JURISDICTION

On June 4, 2020, Defendant-Appellant McKesson Corporation timely removed this case from the District Court of Bryan County, Oklahoma to the United States District Court for the Eastern District of Oklahoma on the basis of federal officer jurisdiction, 28 U.S.C. § 1442 (a)(1). On September 14, 2020, the federal district court issued an order remanding this action to the District Court of Bryan County, Oklahoma.

On September 25, 2020, McKesson filed a Notice of Appeal of the district court's remand order pursuant to 28 U.S.C. § 1447(d). This Court has jurisdiction to review this appeal under 28 U.S.C. § 1291 and 28 U.S.C. § 1447(d).

## STATEMENT OF THE ISSUE

Whether federal officer removal jurisdiction under 18 U.S.C. § 1442(a)(1) is established where the defendant acted under the direction of a federal officer in distributing prescription opioids to federal healthcare providers in the State; the State claims an indivisible public nuisance injury based on the cumulative amount of prescription opioids distributed throughout the State; and the defendant has colorable federal defenses.

## STATEMENT OF THE CASE

This appeal arises out of an order remanding the case to state court based on an erroneous conclusion that the requirements for federal officer removal under 28 U.S.C. § 1442(a)(1) were not met.

The State of Oklahoma brought this case in state court against McKesson, alleging that the company distributed an excessive amount of opioids throughout the State that caused a statewide public nuisance. The State's allegations put at issue the entirety of McKesson's distribution of prescription opioids in Oklahoma during the relevant time period, because the State contends that the public nuisance and harm were caused by the cumulative, allegedly excessive, amount of opioids distributed in the State. Nearly 20 percent of those prescription opioids distributed by McKesson in Oklahoma were to federal healthcare providers at various federal agencies, including the Department of Veterans Affairs, Indian Health Services, and the federal Bureau of Prisons. McKesson distributed those prescription opioids pursuant to the terms of a federal contract under the direction and control of a federal contracting officer. McKesson appropriately removed the case to federal court under 28 U.S.C. § 1442(a)(1), which authorizes removal to federal court of a case against a defendant with a colorable federal defense that was acting under a federal officer, for or relating to an act under color of that office.

The district court erroneously remanded the case on the grounds that the elements of federal officer jurisdiction were not satisfied. The court summarily concluded that the State's Petition did not rely on opioid distributions made under direction of a federal office; that there was not a causal nexus between the State's claims and acts McKesson performed under federal officer direction; and that McKesson did not raise a colorable federal defense. Aplt. App. Vol. 2 at 309-11.[1] The court mistakenly relied on a purported disavowal by the State of any claim related to opioid distributions by McKesson under the federal Contract. The State's disavowal is contradicted by its own allegations of injury and causation based on the cumulative amount of prescription opioids distributed by McKesson throughout Oklahoma. The State's disavowal also cannot be reconciled with its public nuisance claim, which is premised on a single, indivisible injury. Any effort to determine whether the alleged public nuisance could be deconstructed between injury from opioids distributed pursuant to federal directive and opioids otherwise distributed would require ruling on questions of injury and causation that should not be resolved at the removal stage, but rather are to be resolved on the merits in federal court, consistent with the purpose of the federal removal statute.

---

[1] All references to the record are to the page numbers of the concurrently filed Appellant's Appendix. Consistent with 10th Cir. R. 30, the Appendix is consecutively paginated across two volumes, each of which is under 300 pages in length.

## A. STATEMENT OF FACTS

### 1. The Federal Government's Direction of McKesson's Distribution of Prescription Medications to Federal Healthcare Providers in Oklahoma.

Before the 1990s, the federal government handled its own logistics for acquiring, storing and distributing the prescription medications and other medical supplies used and prescribed by federal healthcare providers at federal facilities.[2] This required the federal government to maintain its own centralized system of depots and medical center warehouses, from which bulk orders of prescription medications would be distributed to federal healthcare facilities.[3] Under this legacy distribution system, federal healthcare facilities paid higher-than-market prices, endured long delays of up to 6 weeks for needed medications to be delivered, and would sometimes need to purchase from other supply sources to obtain medications not available through government depots.[4]

In the 1990s, however, the federal government moved to a more efficient means of performing that task through a federal contractor program. The government established the Pharmaceutical Prime Vendor ("PPV") program to

---

[2] Examining VA's Pharmaceutical Prime Vendor Contract Before the House Comm. on Veterans' Affairs, 112th Cong. 40 (2012) (Statement of Hon. W. Scott Gould), available at https://www.govinfo.gov/content/pkg/CHRG-112hhrg73285/html/CHRG-112hhrg73285.htm

[3] *Id.*

[4] *Id.*

engage a federal contractor to provide the logistics and distribution systems for prescription medications and other medical supplies used and prescribed by various federal healthcare providers. The PPV program created an efficient method of "just-in-time" deliveries to federal government healthcare providers at federal agency facilities that use and dispense prescription medications.[5]

Since 2004, McKesson has served as the prime vendor for the federal government's PPV program. Under that federal PPV Contract, McKesson distributed prescription medications and other medical supplies to more than 750 federal healthcare facilities in the United States and abroad, including in the State of Oklahoma. The Department of Veterans' Affairs ("VA") is the federal agency that entered into the federal PPV Contract with McKesson. The VA was primarily responsible for setting the specifications of the PPV Contract and oversaw its performance, and other federal agencies participated in the PPV program to access the prompt and reliable supply of prescription medications that McKesson provides.[6] The federal government relied on McKesson's PPV distributor role as "a critical link

---

[5] Office of Procurement, Acquisition and Logistics, Department of Veterans Affairs, *Prime Vendor Division - Pharmaceutical Prime Vendor (PPV) Program* (Oct. 23, 2020), https://www.va.gov/opal/nac/ncs/ppv.asp

[6] Federal government agencies that participate in the PPV program include the Department of Veterans Affairs, Department of Health and Human Services and its Indian Health Service, the Department of Homeland Security and its Immigration Health Service Corps, and the federal Bureau of Prisons, among others. See Aplt. App. Vol. 1 at 126.

in the supply chain among drug manufacturers, VA hospitals, and Veterans who need treatment"; it "remains the most cost-effective solution to providing timely, cost-efficient, high quality health care products across the country." Examining VA's Pharmaceutical Prime Vendor Contract Before the House Comm. on Veterans' Affairs, 112th Cong. 40 (2012) (Statement of Hon. W. Scott Gould).

The federal PPV Contract identified a specific Contracting Officer who was responsible for management of the PPV Contract, and the contract was amended whenever the identity of the Contracting Officer changed. Aplt. App. Vol. 1 at 230. The Contract required that McKesson arrange, each month, for a McKesson employee to conduct physical visits to federal healthcare sites to answer questions from the federal government, address its billing and inventory problems, and provide information to the government on improvements to contract compliance, among other tasks. Aplt. App. Vol. 1 at 139-40. The Contract also required that a McKesson representative meet, on a quarterly basis, with representatives of the VA and other participating federal facilities to address any issues that may have arisen with McKesson's distributions under the Contract. Aplt. App. Vol. 1 at 230.

### 2. The Detailed Provisions of the Federal Pharmaceutical Prime Vendor (PPV) Contract and Role of the Contracting Officer.

The detailed, 102-page federal PPV Contract imposed strict conditions on McKesson as to whether, when and how McKesson distributed prescription

medications to federal healthcare providers, including in Oklahoma during the period alleged in the State's Petition. For example, the Contract required prompt, typically next-day delivery by McKesson of orders. *See* Aplt. App. Vol. 1 at 130, 162, 164. And it required that orders delivered by McKesson conform to the specifications of the Contract in order to be accepted by the ordering agency. *Id*. at 196.

The Contract also addressed the possibility that pharmaceutical products might be re-purposed for unauthorized or illicit uses: namely, any transfer "that does not serve the ordering activity's defined mission, as well as any transfer for the purpose of generating a profit on the difference between [contract] prices and commercial prices." Aplt. App. Vol. 1 at 204, *see also id*. at 129 (definition). The Contract prohibited McKesson from refusing to fill an order based on concerns it could be used for illicit purposes without informing the federal Contracting Officer within 48 hours of receiving the order. *Id*. at 204. And the Contract specified that the Contracting Officer was authorized to "instruct the Contractor" to fill or resume acceptance of orders if the Officer determined no factual basis for refusing. *Id*. The Contract further specified that certain authorized purchasers could not be suspended from eligibility to receive orders "except on the written instruction" of the Contracting Officer after affording required process. *Id*. The Contract also provided

that McKesson "may not unreasonably delay" filling an order pending any investigation of intended use.  *Id*.

### 3. The Significant Portion of the Allegedly Excessive Amount of Prescription Opioids Covered By Federal PPV Contract Distribution.

From January 1, 2006 through October 31, 2019, the prescription opioids that McKesson distributed in Oklahoma pursuant to the federal PPV Contract and under direction of the Contracting Officer comprised roughly 17.1 percent of the total amount of prescription opioids it distributed in Oklahoma.  Aplt. App. Vol. 1 at 230-31.  That included distributions to federal healthcare facilities located in numerous counties throughout Oklahoma, including Cleveland County, Muskogee County and Tulsa County.  *Id*.  Taken collectively, McKesson distributed more prescription opioids to federal healthcare providers under the federal PPV Contract than to any other single customer in Oklahoma during the period alleged in the State's Petition.

### B. PROCEEDINGS BELOW

### 1. The State's Suit Against McKesson

On May 1, 2020, the State of Oklahoma filed the underlying action against McKesson in the District Court of Bryan County, Oklahoma.  The State's Petition alleges that McKesson distributed an excessive amount of prescription opioids, failed to report and halt distribution of prescription opioid orders that were suspicious because of unusual size, pattern, or frequency, and failed to prevent diversion of prescription opioids, thereby causing harm to the State and its citizens.

Aplt. App. Vol. 1 at 38, 42, 49. The Petition asserts causes of action for negligence, public nuisance under 50 Okla. Stat. § 2, and unjust enrichment. *Id*. at 52-56.

The Petition relies on and cites to data from the federal Drug Enforcement Administration ("DEA") to allege that McKesson accounted for 23 percent of the total volume of prescription opioids distributed from 2006-14 in Oklahoma. Aplt. App. Vol. 1 at 43 & n.8 (citing reporting from DEA database); *see also Id*. at 46 & n.9 (citing reporting from DEA database for several individual counties). The Petition alleges that "McKesson knew, or should have known, that the amount of opioids that it delivered into Oklahoma was far in excess of what could be consumed for medically-necessary purposes in the relevant communities." *Id*. at 44.

The State bases its allegations of harm caused by McKesson on that alleged 23 percent share of prescription opioids distributed by McKesson in Oklahoma. Aplt. App. Vol. 1 at 43. That volume of overall prescription opioid distributions by McKesson "include[s] opioid distributions that McKesson made to PPV Contract facilities." *Id*. at 231.

The Petition further alleges that the purported excessive distribution of opioids by McKesson in Oklahoma was the "but for" cause of the State's need to devote "substantial public resources and funding on opioid use, misuse and addiction education, prevention and intervention programs." Aplt. App. Vol. 1 at 34; *see also id*. at 23, 31-33, 49, 53, 55 (alleging harm from increased costs to the State and its

citizens for health care, opioid-dependency treatment, ambulance services, hospital and emergency department services, criminal justice, lost work and economic productivity, and public education prevention programs). These allegations draw no distinction between the harm allegedly caused by McKesson's distributions to non-federal healthcare providers as opposed to McKesson's distributions under the federal PPV Contract. *Id*. at 32-34. At the close of the Petition, and without disclaiming the facts alleged to support its claimed injury and the damages it seeks, the Petition states that "in the event McKesson seeks to remove this case," the State disavows "any . . . claim for recovery related to opioids distributed by McKesson that could give rise to federal subject matter jurisdiction" and that were "distributed to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract including but not limited to any Pharmaceutical Prime Vendor Contract." *Id*. at 56.

## 2. Removal to Federal Court and the District Court's Remand Order

On June 4, 2020, McKesson timely removed this case to the Eastern District of Oklahoma under the federal officer removal statute, 28 U.S.C. §1442(a)(1), which provides for removal to federal court of any civil action commenced in a state court against the United States, a federal agency or officer thereof, "or any person acting under that officer," "for or relating to any act under color of . . . the federal office." The Notice of Removal addressed why the State's purported disavowal of claims

based on McKesson's federal distributions could not defeat removal: namely, the State's public nuisance claim, based on distribution of an allegedly excessive amount of opioids throughout the State, cannot be divided between opioids distributed by McKesson under the federal PPV Contract and other opioid distributions by McKesson in the State. Aplt. App. Vol. 1 at 15-18. The State filed a motion to remand, *id*. at 62-92, and McKesson opposed. *Id*. at 93-124.

On September 14, 2020, the federal district court issued an order remanding this action to the District Court of Bryan County, Oklahoma. Aplt. App. Vol. 2 at 309-11. The court rejected McKesson's argument that the case is removable "because the State's allegations relate to and necessarily implicate McKesson's distribution of opioids to federal facilities throughout Oklahoma under the requirements of a federal contract and under the direction of a federal officer," including the Department of Veterans Affairs, Indian Health Services, and the federal Bureau of Prisons. *Id*.

The district court summarily concluded that "[t]he State pleaded state law causes of action based on non-PPV Contract opioid distributions" that were "not made under the direction of a federal officer," and that there was "no causal nexus between the State's claims and any acts McKesson performed under a federal officer's direction." Aplt. App. Vol. 2 at 310. And the court ruled that McKesson did not have a colorable federal government contractor defense because the State

disavowed any federal claims, and did not have a federal preemption defense. *Id.* at 311. The court declined to award attorneys' fees or to stay execution of its judgment pending appeal, and immediately remanded this action to the District Court of Bryan County, Oklahoma. *Id.*

On September 25, 2020, McKesson timely filed a Notice of Appeal of the district court's remand order pursuant to 28 U.S.C. § 1447(d). Aplt. App. Vol. 2 at 313.

## STANDARD OF REVIEW

This Court reviews the propriety of removal *de novo*, as a matter of law. *Bd. of Cty. Commissioners of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, 965 F.3d 792, 819 (10th Cir. 2020) (citing *Frederick v. Hartford Underwriters Ins. Co.*, 683 F.3d 1242, 1245 (10th Cir. 2012)).

## SUMMARY OF ARGUMENT

The district court's remand of this case to state court violated the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides McKesson, as an entity with a federal defense acting under the direction of a federal officer relating to an act under color of that office, with the right to remove this case to federal court.

McKesson readily meets the three requirements for federal officer removal as recently articulated by this Court. *See Suncor Energy*, 965 F.3d at 825. First, McKesson acted under direction of a federal officer when it provided specialized

logistical and distribution services in distributing prescription opioids in Oklahoma to federal healthcare providers, under the terms of the federal PPV Contract and subject to the direction of a federal Contracting Officer. That is a task that the federal government would otherwise be required to perform itself (and, indeed, previously had performed) if it did not engage McKesson to provide that service to meet fundamental federal needs. McKesson's distributions under the federal PPV Contract did not merely require compliance with the law, but were subject to detailed specifications of the federal Contract and were subject to the direction and control of the federal Contracting Officer.

Second, there is a causal nexus between the acts performed by McKesson under federal officer direction and the State's claims that McKesson injured the State through its distribution of an allegedly excessive amount of prescription opioids throughout Oklahoma. Indeed, the State's allegations of injury caused by McKesson are based on distribution data that include McKesson's distributions to federal healthcare providers under the federal PPV Contract. Aplt. App. Vol. 1 at 43 & n.8, 46 & n.9; *id*. at 230-31. Moreover, the State's allegations that McKesson distributed an excessive total amount of prescription opioids are indivisible between distributions to federal and non-federal customers. The State's allegations draw no distinction between the harm allegedly caused by McKesson distributions to non-federal agency healthcare providers that dispensed opioids in Oklahoma, as opposed

to McKesson's distributions under the federal PPV Contract to federal agency health care providers that dispensed opioids in Oklahoma. *Id*. at 32-34

The State's summary disavowal at the close of its Petition does not alter the inherent connection between its claims and McKesson's federally-directed distribution of prescription opioids. Aplt. App. Vol. 1 at 56. That disavowal is contrary to the State's repeated allegations throughout the Petition that a public nuisance was caused by the supposedly excessive and unreasonable amount of opioids McKesson cumulatively distributed throughout the State of Oklahoma, which includes its distributions under the federal PPV Contract. *Id*. at 34, 42, 48-49. Nearly 20 percent of those distributions were made under the federal PPV Contract. The State already has acknowledged in other litigation that the public nuisance gave rise to an indivisible injury, Aplt. App. Vol. 2 at 264-66, which by its very nature necessarily encompasses opioids distributed by McKesson under the federal PPV Contract. And the State's purported disavowal would require premature resolution of issues of injury and causation that should be decided on the merits in federal court, consistent with the purpose of the federal officer removal statute.

Third, McKesson raised a valid federal government contractor defense under *Boyle v. United Techs. Corp.* 487 U.S. 500, 512 (1988)*,* because the opioid distributions that the State alleges caused it harm included distributions made in strict compliance with the specifications of the federal PPV Contract, which did not

permit McKesson to unilaterally refuse to distribute opioids ordered by federal entities under the Contract. To hold McKesson liable under state law for its alleged conduct (the alleged failure to report and stop certain shipments) regarding the prescription opioids it distributed would conflict with the terms of the federal Contract and would undermine the federal government's interest in ensuring that federal facilities promptly receive the prescription medications needed to serve veterans, members of Indian tribes, federal prisoners, and others in Oklahoma. McKesson also raised a valid federal preemption defense based on the conflict between the State's claims and the federal statutory and regulatory framework governing federally registered distributors under the Controlled Substances Act (CSA).

The district court's remand order should, therefore, be reversed.

## ARGUMENT

**THE DISTRICT COURT ERRED IN REMANDING THE CASE TO STATE COURT BASED ON ITS INCORRECT VIEW THAT THE FEDERAL OFFICER REMOVAL STATUTE WAS NOT SATISFIED.**

The federal officer removal statute authorizes "any person acting under" an officer of a federal agency to remove to federal court a civil action "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). This Court has held that a defendant "may remove a case under § 1442(a)(1) if it can show: (1) that it acted under the direction of a federal officer; (2) that there is a causal nexus between

the plaintiff's claims and the acts the [defendant] performed under the federal officer's direction; and (3) that there is a colorable federal defense to the plaintiff's claims." *Suncor Energy (U.S.A.) Inc.*, 965 F.3d at 820.

The Supreme Court has made clear that the federal officer removal statute is "liberally construed" in favor of removal, as compared to the general removal statute, which is not. *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007) (citation omitted); *Suncor Energy (U.S.A.) Inc.*, 965 F.3d at 820 (same). And the Supreme Court "has held that the right of removal" under the federal officer removal statutes is "absolute" for conduct "performed under color of federal office," and has "insisted that the policy favoring removal should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981).

The federal officer statute permits removal to federal court even when a plaintiff alleges exclusively state law claims that could not have been brought in federal court in the first instance. *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006). "One of the primary purposes" of the federal officer removal statute is "to have [federal] defenses" that are asserted by a removing defendant "litigated in the federal courts" rather than in state court. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). In order to remove a case under the federal officer removal statute, "there need be only '*a connection or association* between the act in

17

question and the federal office.'" *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (citation omitted). And no federal question need "appear on the face of a properly pleaded complaint" for removal under the federal officer removal statute. *Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 431 (1999). "[T]he federal-question element" of a federal officer removal "is met if the *defense* depends on federal law." *Id.* (emphasis added).

### A. McKesson Acted under the Direction of A Federal Officer When It Distributed Prescription Opioids to Federal Entities in Oklahoma.

The first factor for federal officer removal – that a defendant "acted under the direction of a federal officer" – is met where the defendant "'lawfully assist[ed]' a federal officer 'in the performance of his official duty.'" *Watson*, 551 U.S. at 151 (citation omitted). A defendant acts under the direction of a federal officer if it "help[ed] officers fulfill . . . basic governmental tasks . . . that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 153-54. For a relationship between a private contractor and the government to meet this factor, it must involve "subjection, guidance, or control" and "go[] beyond the fulfillment of regulatory or statutory requirements." *Suncor Energy (U.S.A.) Inc.*, 965 F.3d at 822 (citing *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)) (further citations omitted).

In summarily holding that McKesson's "distributions were not made under the direction of a federal officer," Aplt. App. Vol. 2 at 310, the district court ruled

18

contrary to this clear precedent. McKesson's distribution of prescription opioids to federal facilities in Oklahoma helped the government carry out basic tasks that the government otherwise would have performed itself (indeed, the government previously had performed these tasks). Moreover, McKesson's acts pursuant to the federal PPV Contract were not merely required to comply with statutes or regulations, but were governed by detailed requirements of the federal government and were performed under the guidance and control of the federal government.

>    **1.      McKesson Assisted the Government in Fulfilling A Basic Task That the Government Otherwise Would Have Performed.**

When the federal government established the PPV Contract program for the acquisition, storage and distribution of prescription medications to federal healthcare providers, it did so to replace its own performance of those tasks with a contracting method that enabled "just-in-time acquisition and inventory processes and efficient online systems for placing orders." *Examining VA's Pharmaceutical Prime Vendor Contract Before the House Comm. on Veterans' Affairs*, 112th Cong. 40 (2012) (Statement of Hon. W. Scott Gould); *see also supra* pp. 5-7. The VA recognized that the PPV program assigns a private contractor – McKesson – the task of operating a "warehousing system for storing and distributing drugs and supplies" that the VA would otherwise need to provide. *Id*.

Under the federal PPV Contract, McKesson distributes prescription medications, including opioids, for the federal government to more than 750 VA centers and federal facilities in the United States and abroad, including facilities operated by other federal agencies such as the Indian Health Services and federal Bureau of Prisons. Aplt. App. Vol. 1 at 126. The program is essential in Oklahoma, where the federal healthcare facilities that obtain the prescription medications to use and dispense under the PPV Contract collectively represented McKesson's largest customer in the State for prescription opioids, accounting for nearly 20 percent of its distributed prescription opioids from 2006 through late 2019. *Id*. at 230-31.

By promptly and reliably distributing prescription medications to federal healthcare facilities in Oklahoma under the detailed specifications of the federal PPV Contract, McKesson assists federal entities to carry out their multiple statutory responsibilities to provide healthcare to veterans, members of federally recognized Indian tribes, and federal prisoners. *See Suncor Energy (U.S.A.) Inc.*, 965 F.3d at 823. For example, one of the purposes of the Veterans' Administration is "to administer the laws providing benefits and other services to veterans and the dependents and the beneficiaries of veterans." 38 U.S.C. § 301(b). The Indian Health Service was created to "more effectively and efficiently carry out the responsibilities, authorities, and functions of the United States to provide healthcare services to Indians and Indian tribes." 25 U.S.C. § 1661(a)(1). And the federal

Bureau of Prisons is legally charged with providing healthcare treatment to prisoners both by constitutional and statutory obligation. *Brown v. Plata*, 563 U.S. 493, 510-11 (2011) ("Prisoners are dependent on the State for food, clothing, and necessary medical care . . . . If government fails to fulfill this obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation."); 18 U.S.C. § 4048(f) (barring the denial of healthcare treatment to insolvent prisoners). McKesson therefore clearly "help[s] the Government" procure, store and distribute "an item that it needs," in a timely manner that is especially critical to healthcare providers and fills in for the government's necessary role in this logistics and distribution process. *See Watson*, 551 U.S. at 153.

The VA itself has confirmed that McKesson's performance of the PPV Contract is "a critical link in the supply chain among drug manufacturers, VA hospitals, and Veterans who need treatment" and "remains the most cost-effective solution to providing timely, cost-efficient, high quality health care products across the country." Examining VA's Pharmaceutical Prime Vendor Contract Before the House Comm. on Veterans' Affairs, 112th Cong. 40 (2012) (Statement of Hon. W. Scott Gould). Thus, by operating a complex acquisition, storage and distribution logistics network to supply prescription medications to federal healthcare facilities, McKesson "stand[s] in for critical efforts the federal superior would be required to undertake itself in the absence of a private contract," *Suncor Energy (U.S.A.) Inc.*,

965 F.3d at 823. Through its distribution of prescription medications, including opioids, to veterans, members of Indian tribes, federal prisoners and others, McKesson "work[s] hand-in-hand with the federal government to achieve a task that furthers an end of the federal government." *See Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012); *see also Goncalves v. Rady Children's Hops. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017) (health insurer that contracted with OPM to administer health benefits plan and pursue subrogation claims was acting under federal officer for purposes of federal officer removal statute); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1088 (6th Cir. 2010) (contractor was acting under federal officer for purposes of federal officer removal statute when it "helped FAA officers carry out their task of ridding a federal employee occupied building of an allegedly hazardous contaminant"); *Isaacson*, 517 F.3d at 137 (companies that contracted to produce Agent Orange were acting under a federal officer, in that they "assist[ed] and help[ed] carry out[] the duties or tasks of officers at the Department of Defense").

Without McKesson's distribution of prescription medications, including opioids, the federal government would be forced to take the job back and perform the tasks itself, as it did before it created the PPV Contract program. *See* Examining VA's Pharmaceutical Prime Vendor Contract Before the House Comm. on Veterans' Affairs, 112th Cong. 40 (2012) (Statement of Hon. W. Scott Gould).

## 2. McKesson Acted Under the Guidance and Control Of the Federal PPV Contract and Contracting Officer.

The federal PPV Contract did not merely provide for McKesson to "fulfill[] regulatory or statutory requirements," but required adherence to detailed provisions regarding filling orders and timely distribution that this Court has recognized as supporting federal officer removal. *See Suncor Energy (U.S.A.) Inc.*, 965 F.3d at 822 (citing *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)) (further citations omitted). Moreover, McKesson's distribution of prescription medications, including opioids, to federal healthcare providers was under the "strict guidance and control" of the federal Contracting Officer as set forth in the various provisions of the PPV Contract discussed above, which meets the standards for federal officer removal recognized by *Suncor*. *See id.* at 823. This is not a circumstance where the contractor's role simply involved "supplying the government with widely available commercial products or services." Instead, it called for an extensive logistics and distribution service that "specifically conformed to government use." *Id*. at 826.

The MDL Court in the Northern District of Ohio, the only court to have analyzed the specific terms of McKesson's federal PPV Contract, found that McKesson was acting under the direction of a federal officer because it was obligated to distribute prescription medications, including opioids, to federal healthcare facilities under "the precise specifications of the PPV Contract with regard to quality and order," which were "overseen by a federal government

23

contracting officer who had final say over whether McKesson could choose not to fill an order." *In re Nat. Prescription Opiate Litig.*, 327 F.Supp.3d 1064, 1076 (N.D. Ohio 2018). And the court recognized that, "absent McKesson's distributions pursuant to the PPV Contract, the VA would have to warehouse and distribute drugs itself, a job it formerly did but abandoned in favor of the PPV Program." *Id.*

With regard to distribution of prescription medications in particular, the court emphasized that, under the federal PPV Contract, "McKesson ultimately had little discretion whether to fill an order, and could not unilaterally choose to not fill a government order or otherwise suspend a [federal purchaser under the Contract]." *Id.* at 1073. The court concluded that "McKesson inarguably has a contractual relationship with the government and has retained little, if any, freedom to decide whether to fill orders pursuant to the PPV Contract." *Id.* at 1074. "McKesson has only limited ability to refuse, and even when they refuse to fill an order, that decision is ultimately at the discretion of the federal contracting officer." *Id.* at 1075.

Furthermore, the federal PPV Contract contains much more than the "boilerplate provisions" of standard commercial contracts that this Court found in *Suncor* were inadequate for federal officer removal. *Suncor Energy (U.S.A.) Inc.*, 965 F.3d at 825. Rather, the Contract is replete with unique procedures for the filling and distribution of federal orders for prescription medications to federal healthcare providers: For example, it required (i) that McKesson follow the Contract's

specifications and conditions each time it filled a federal government order[7]; (ii) that McKesson "maintain an adequate supply and distribute all drug/pharmaceutical . . . items and other contracted items dispensed . . . under Government supply contracts"; (iii) that every order be processed through a special electronic system that McKesson provided and maintained on behalf of participating federal agencies; and (iv) that all orders to certain VA outpatient clinics, mail-order pharmacies, and Indian Health Service facilities be confirmed within 30 minutes of being placed. *See* Aplt. App. Vol. 1 at 135 (§ I-1 Scope (a)), 151 (§ I-9 Ordering), 154 (Satellite Facility Split-Screen Ordering), 158 (§ I-10 Expiration Dating).

In addition, the Contract provided that, upon receipt of an approved order from a participating government facility, McKesson generally had to "provide *next day* … delivery" of the order. Aplt. App. Vol. 1 at 153 (emphasis added). With respect to certain customers, such as VA mail-order pharmacies, the Contract required McKesson to ship "bulk orders and bulk delivery of pharmaceuticals and products" when asked and "provide deliveries twice per day to any [facility] upon request." *Id*. at 137, 167. The Contract also required McKesson to ensure that at least *97 percent* of the pharmaceuticals and other items ordered were filled in the timeframe demanded by the ordering facility. *Id*. at 162. In the event that McKesson's

---

[7] *See* Aplt. App. Vol. 1 at 137 (§ I-1 Scope (g)) ("All items ordered shall be provided to the ordering facilities in accordance with the terms and conditions of the PPV contract").

fulfillment rate fell below that percentage, the Contract required that McKesson establish alternate distribution centers to "fulfill the requirements of the customer and to prevent product outages that may endanger the patients." *Id*. at 164. In some instances, the Contract required McKesson to "first fill government orders before filling its commercial-based customers' orders." *Id.* at 151.

The Contract provided specific guidance and control regarding prescription medications, including controlled substances such as opioids. The Contract specified that McKesson's "responsibility to release and deliver the customer's Control Drug order under the terms and conditions outlined" in the Contract commenced upon McKesson's receipt of an order for controlled substances. Aplt. App. Vol. 1 at 153. The Contract did not grant McKesson the discretion to deny an order on the grounds that it might be used for unauthorized or illicit purposes, unless McKesson notified the Contracting Officer "within 48 hours and state[d] the basis for the refusal," after which the facility would have an "opportunity to present its position." *Id*. at 204. The Contract further specified that the federal Contracting Officer retained ultimate authority to decide whether to distribute certain orders. *Id.* ("The [Contracting Officer] may instruct the Contractor to fill an executive-agency-level order and/or resume acceptance of executive agency indirect orders …."). And the Contract specified that certain authorized purchasers could not be suspended from eligibility under the Schedule "except on the written instruction" of the

26

Contracting Officer. *Id.* The Contract also provided that McKesson "may not unreasonably delay" filling an order pending any investigation of intended use. *Id.*

To ensure McKesson's compliance with the exacting specifications of the Contract, the federal government provided guidance and control at multiple levels over McKesson's distribution of prescription medications, including prescription opioids. The VA had a Contracting Officer who was responsible for management of the Contract. Aplt. App. Vol. 1 at 230. The Contract identified a specific person as that Contracting Officer, and the Contract was amended whenever the identity of the Contracting Officer changed. *Id.* The federal government required that McKesson arrange, each month, for a McKesson employee to conduct physical visits to federal healthcare sites to answer questions from the government, address its billing and inventory problems, and provide information to the government on improvements to contract compliance, among other tasks. *Id.* at 139-40 (§ I-4 Customer Service). The federal government also required that a McKesson representative meet, on a quarterly basis, with representatives of the VA and other participating federal facilities, to address any issues that may have arisen with McKesson's distribution under the Contract. *Id.* at 230.

In short, through these detailed provisions of the PPV Contract, the federal government exercised extensive control and direction over a substantial portion of McKesson's supply chain in Oklahoma. And, in particular reference to the State's

allegations that McKesson distributed an "excessive" volume of prescription opioids in Oklahoma, the federal government exercised extensive control and direction over the amount of opioids that McKesson delivered in the State, to its largest single customer in the State.

The terms of the federal PPV Contract that provided close government supervision of McKesson distinguishes this case from others where a removing defendant was required merely to comply with generic, industry-wide statutes or regulations. *See Suncor Energy (U.S.A.) Inc.*, 965 F.3d at 823; *Watson*, 551 U.S. at 157. The federal PPV Contract's procedures are not "mere iterations of . . . regulatory requirements" that would apply to any pharmaceutical distributor. *Suncor Energy (U.S.A.) Inc.*, 965 F.3d at 824. To the contrary, and as the MDL court recognized, "McKesson was subject to the precise specifications of the PPV Contract with regard to quality and ordering," and "overseen by a federal government contracting officer who had final say over whether McKesson could choose not to fill an order." *In re Nat. Prescription Opiate Litig.*, 327 F.Supp.3d at 1076. Taken together, the government's "detailed specifications," "compulsion to provide the [service] to the government's specifications, and . . . on-going supervision" demonstrated that McKesson acted under federal direction and control in distributing prescription opioids to federal healthcare facilities in Oklahoma. *See Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 400 (5th. Cir. 1998).

**B. The State's Claims Relate to McKesson's Acts under Direction of a Federal Officer.**

In determining whether a plaintiffs' claims have an adequate connection to the defendants' actions under direction of a federal officer, such that they are "for or relating to" acts under color of that federal office, 28 U.S.C. § 1442 (a)(1), the showing required "is quite low." *Isaacson,* 517 F.3d at 137 (citation omitted). And the Supreme Court has made clear that a federal court should credit the *defendant's* theory of removal in determining whether an adequate connection exists under the federal officer removal statute. *Acker*, 527 U.S. at 432.

A defendant does not need to establish a direct causal nexus between its federally-directed conduct and the plaintiff's allegations. *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 291, 296 (5th Cir. 2020) (en banc). The alleged conduct simply needs to "pertain . . . to" or "stand in some relation" with acts done under color of federal office. *Id*. at 292. "There need be only 'a *connection or association* between the act in question and the federal office.'" *Sawyer*, 860 F.3d at 258 (citations and alterations omitted); *accord Baker v. Atlantic Richfield Co.*, 962 F.3d 937 (7th Cir. 2020); *Goncalves*, 865 F.3d at 1250; *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017).

1. **The State's Claims Relate to McKesson's Distribution of Opioids under the Federal PPV Contract.**

Central to the State's claims of injury and causation is the allegation that McKesson distributed an excessive amount of opioids throughout Oklahoma, Aplt. App. Vol. 1 at 31, 42, thereby "fuel[ing] Oklahoma's opioid crisis" and causing increased costs to the State for which it seeks damages. *Id*. The State contends that "McKesson's massive and patently unreasonable supply of opioids in Oklahoma" is the "*but for*" cause of numerous opioid-related injuries, including "a public nuisance . . . affect[ing] entire communities, neighborhoods, and considerable numbers of persons" across the State. *Id*. at 34 (emphasis added), 55. The State thereby seeks to recover the "enormous social and economic costs including increased health care, criminal justice, and lost work productivity expenses" that were allegedly caused by the cumulative amount of opioids in the State. *Id*. at 32.

The State's claims are thus related to the total amount of opioids distributed by McKesson throughout Oklahoma, which includes the nearly 20 percent of that amount distributed pursuant to the federal PPV Contract. There is clearly a "connection or association" between the State's claims that McKesson distributed an excessive amount of opioids in the State and the significant part of that amount distributed under the federal PPV Contract. In other words, the "charged conduct" in this case, the distribution of an allegedly excessive amount of opioids throughout Oklahoma, is plainly "connected with" or "relate[d] to" McKesson's distribution of

opioids in Oklahoma to its *single largest customer* in the State – the federal government. *See Latiolais*, 951 F.3d at 296. This is more than sufficient to meet the "low bar that the causal-connection prong requires." *Goncalves*, 865 F.3d at 1245.

Moreover, the State's Petition expressly relies on data from the federal DEA to allege that McKesson accounted for 23 percent of the total amount of prescription opioids distributed in Oklahoma from 2006-14, purportedly making it the largest distributor of opioids in the State. Aplt. App. Vol 1 at 43 & n.8 (citing reporting on DEA database). And the State's allegations of harm caused by McKesson are based on that contention that McKesson accounted for 23 percent of total prescription opioid distributions in Oklahoma. *Id*. The Petition's allegations of McKesson's share of total opioid distributions "include[s] opioid distributions that McKesson made to PPV Contract facilities." *Id*. at 230-31. These allegations draw no distinction between the harm allegedly caused by McKesson's distribution to non-federal agency healthcare providers that dispensed opioids in Oklahoma, as opposed to McKesson's distribution under the federal PPV Contract to federal agency health care providers that dispensed opioids in Oklahoma. *Id*. at 32-34.

There also is a connection between McKesson's actions under the federal PPV Contract and the State's allegations that McKesson wrongfully failed to report or stop shipment of certain orders. The State alleges that McKesson "consistently failed to report or suspend illicit orders" of opioids, and should have "stopped or

investigated as suspicious orders" an unspecified portion of the prescription opioids it distributed in Oklahoma over an eight-year period. Aplt. App. Vol 1 at 43, 48. Had McKesson declined to fill these orders, the State alleges, there would not have been an excessive amount of opioids in the State, and "the State and its citizens would have avoided significant injury." *Id.* at 49.

But McKesson did not control the amount of prescription opioids it distributed to federal healthcare providers in Oklahoma. The federal PPV Contract required McKesson to distribute at the amount and frequency mandated by orders from federal healthcare providers, and in conformance with the detailed specifications set by the VA and enforced by the Contracting Officer. The Contract did not allow McKesson to unilaterally decline to fill orders placed by federal healthcare entities or to suspend federal purchasers from eligibility for shipments of prescription opioids or other medicines. The ultimate authority over these issues was reserved to the federal Contracting Officer. *See supra* pp. 24-27.

As such, McKesson's actions "under the direction of a federal officer" pursuant to the federal PPV Contract relate to the State's allegations that McKesson should have prevented or refused to fill some number of orders for prescription opioids in Oklahoma. *See In re Nat. Prescription Opiate Litig.*, 327 F. Supp.3d at 1077 (holding that "there is a causal nexus between McKesson's action under the direction of a federal officer (filling orders pursuant to the PPV contract) and

[plaintiff's] claim of opioid diversion (that McKesson knew or should have known that the orders were suspicious and should not have filled them)").

### 2. The State's Purported Disavowal Cannot Override the Relationship between Its Claims and McKesson's Federally-Controlled Distribution.

The State's Petition purports to disavow any cause of action or claim for recovery related to opioids distributed by McKesson under the federal PPV Contract. *See supra* p. 11. But that purported disavowal contradicts the allegations that underlie the State's public nuisance claim and its theory of causation and resultant injury. The State's attempt to prove injury and recover damages based on the cumulative amount of opioids distributed by McKesson in Oklahoma, where nearly 20 percent of that amount was distributed at the direction of a federal officer, is a matter for determination by a federal court, consistent with the purpose of the federal officer removal statute.

Although disclaimers of federal claims in a complaint divest a court of federal *question* jurisdiction, such disclaimers do not defeat removal based on the federal *officer* statute. *In re Asbestos Prod. Liab. Litig. (No. VI)*, 770 F.Supp.2d 736, 741 (E.D. Pa. 2011). This is because a defendant that acted under the direction of a federal officer may "remove a case based on the existence of a federal defense that is not apparent from the claim alleged." *Id*. at 742 (citing *Acker*, 527 U.S. at 431). Moreover, "while removal under 28 U.S.C. § 1441 is to be strictly construed, with

doubts resolved in favor of remand, the federal officer removal statute, by contrast, is to be broadly construed in order to liberally grant federal officers access to a federal forum." *Id*. at 741 (quotations and citations omitted). Accordingly, "the fact that [a] Plaintiff['s] complaint expressly disavows any federal claims *is not determinative*" as to whether federal officer jurisdiction lies over a suit. *Ballenger v. Agco Corp.*, 2007 WL 1813821, at *2 (N.D. Cal. June 22, 2007) (emphasis added).

a) **The State's allegations of causation and injury as specifically pled put at issue *all* opioids distributed by McKesson in Oklahoma, including under the federal contract.**

The State's disavowal of any cause of action or claims for recovery related to opioids distributed pursuant to McKesson's federal PPV Contract contradicts its detailed allegations of causation and injury, which rely on the cumulative amount of opioids distributed by McKesson in Oklahoma to support the State's theory of liability.

The State's case turns on the allegations that McKesson distributed an excessive amount of opioids throughout the State, and that this caused its alleged injury. According to the Petition, the total amount of opioids McKesson distributed in Oklahoma was the "but for" cause of the State's injuries. Aplt. App. Vol 1 at 34. Because McKesson's distributions under the federal PPV Contract made up a substantial portion of the total amount of opioids that the State repeatedly claims

was "patently unreasonable," *id*. at 31, the disavowal cannot be reconciled with the allegations in the Petition that are central to the claims for relief.

Moreover, as noted above, the State's allegations are based on federal data that specifically includes prescription opioids McKesson distributed to federal healthcare providers under the federal PPV Contract. Aplt. App. Vol. 1 at 230-31 (confirming that the statewide and county-level data referenced in the Petition include federal PPV distributions). The State cited that data in an attempt to offer *prima facie* evidence that McKesson's distributions were excessive and reflective of illegal diversion. *Id*. at 43 & n.8, 46 & n.9. Having relied on data that included the opioids distributed by McKesson to federal healthcare providers under the federal PPV Contract, the State cannot at the same time disavow in the closing paragraph of its allegations any claim related to those opioids. *See Despres v. Ampco-Pittsburgh Corp.,* 577 F.Supp.2d 604, 608 (D. Conn. 2008) ("Plaintiffs cannot have it both ways. On[] the one hand, they seek to hold [defendant] liable for the asbestos exposure traceable to [a predecessor's] work for the Navy; on the other, they claim [defendant] has no right to remove on the basis of a colorable federal defense.").

**b)** **The State's purported disavowal would require premature resolution of issues of injury and causation that should be resolved on the merits in federal court, consistent with the purpose of the federal officer statute.**

The State's purported disavowal of any claim for recovery related to opioids distributed by McKesson in Oklahoma under the federal PPV Contract would require a premature ruling on fact-specific issues of causation and injury at the removal stage. That would run contrary to the very purpose of the federal officer statute, which is to have a case resolved on the merits in federal court when it is brought against a defendant acting under a federal officer, relates to such acts, and involves a colorable federal defense. *See Baker*, 962 F.3d at 947 (in deciding on federal officer removal, courts "are concerned with *who* makes the ultimate determination, not *what* that determination will be"; the court's "role at this stage of the litigation is to credit only the [defendant's] theory") (emphasis added) (citations and alterations omitted).

Significantly, the State's purported disavowal stands in contradiction to the recovery it seeks for an alleged "opioid crisis in Oklahoma that constitutes a public nuisance . . . affect[ing] entire communities, neighborhoods, and considerable numbers of persons." Aplt. App. Vol. 1 at 55. According to the State, the public nuisance encompasses years of overdoses, addictions, increased health care costs, criminal justice costs, and decreased economic productivity across the entire State

of Oklahoma. *Id*. at 54-55. And as the State acknowledged in litigation against pharmaceutical manufacturers, its theory of liability is that "[t]he Oklahoma opioid crisis" underlying its public nuisance claim "clearly constitutes a *single indivisible injury*." Aplt. App. Vol. 2 at 264 (emphasis added). As the State itself explained, "[a]n injury is indivisible due to an inability to divide the injury itself or because the plaintiff cannot divide the injury among the wrongdoers." *Id.* at 265. Furthermore, the State also contended that because it alleged the opioids produced by different pharmaceutical manufacturers, in the aggregate, had created the alleged public nuisance, liability was "*not subject to individualized proof*" among the defendants. *Id*. (emphasis added).

Here, the State seeks to recover for the same public nuisance claim that it brought against pharmaceutical manufacturers. *Compare* Aplt. App. Vol. 1 at 55 (alleging that "McKesson's massive and unreasonable distribution of opioids" has "contributed to . . . a public nuisance . . . affect[ing] entire communities, neighborhoods, and considerable numbers of persons"), *with* Aplt. App. Vol. 2 at 260-61 (alleging that manufacturers created a public nuisance that "'endanger[ed] the comfort, repose, health or safety' of a 'considerable number of persons'"). As pleaded by the State, the public nuisance injury would be similarly "indivisible" and "not subject to individualized proof," Aplt. App. Vol. 2 at 265, thus belying the

State's attempt to exclude from the scope of its claims any opioids that McKesson distributed under the federal PPV Contract.

But even if a court were to disregard the State's own prior arguments that its public nuisance claim is indivisible, the State's purported disavowal of any claim based on McKesson's distribution of prescription opioids under the federal PPV Contract presents a fact-based, merits question as to whether the State's claimed injury from an allegedly excessive amount of prescription opioids can be separated and divided between opioids distributed in Oklahoma under the federal PPV Contract, as compared to opioids distributed to non-federal customers in Oklahoma. The court also would need to determine whether the harms alleged by the State due to a purportedly excessive amount of opioids distributed by McKesson would have occurred without the federally-directed distributions by McKesson. And the court would be required to embrace a particular theory of causation that is inextricably intertwined with the merits of the claims against McKesson.

Those are core issues of causation and injury that should not be decided on a remand motion. They are issues that should be decided on the merits in federal court, consistent with the purpose of the federal officer removal statute, because they involve the very acts taken under direction of a federal officer that are intended to be resolved in federal court. Because these "are *merits questions* that a federal court should decide," *Baker*, 962 F.3d at 944, the State cannot simply disavow the

connection between its allegations, which put at issue the cumulative amount of opioids distributed in Oklahoma, and the substantial portion of that amount that was distributed pursuant to the federal PPV Contract under direction of the federal government.

As courts have recognized, "the resolution of material factual disputes" relevant to the propriety of removal should be left "to the [federal] trier of fact when the issue of subject-matter jurisdiction is intertwined with an element of the merits of the plaintiff's claim." *Leite v. Crane Co.*, 749 F.3d 1117, 1122 n.3 (9th Cir. 2014). This is particularly true in the context of federal officer removal, where courts must "credit [the] [d]efendant['s] theory of the case when determining whether a causal connection exists." *Isaacson,* 517 F.3d at 137; *Leite*, 749 F.3d at 1124 (same).

Thus, a disavowal of claims based on actions taken at the direction of a federal officer is ineffective to defeat federal officer removal where it requires a premature decision on an issue of causation relevant to the merits of a plaintiff's case. *See, e.g., Marley v. Elliot Turbomachinery Co.*, 545 F.Supp.2d 1266, 1274 (S.D. Fla. 2008) (rejecting disclaimer whose applicability "depend[ed] on a determination of the core question in this case: whether the defendant's purported omission—the failure to warn—was required or caused by their contractual relationship with the Navy").

Significantly, the Seventh Circuit recently held in *Baker* that a disavowal similar to the State's disavowal here could not defeat federal officer removal

jurisdiction. The plaintiff there had alleged injuries from exposure to toxic chemicals produced by the defendants, but disavowed any recovery pertaining to the defendants' manufacture or production of the chemicals for the federal government because the defendants operated under government commands for part of the relevant time span – 20 percent of the period at issue for one defendant, and 5 to 15 percent for the other. *Baker v. Atl. Richfield Co.*, 421 F.Supp.3d 634, 643 (N.D. Ind. 2019), *rev'd and remanded*, 962 F.3d 937 (7th Cir. 2020). There as here, the defendants removed the case under the federal officer removal statute. *Id*. There, as here, the district court granted plaintiff's remand motion on the ground that the disavowal waived any claims implicating the defendants' operations under federal government command. *Id*. And there the court of appeals reversed and vacated the remand order, *Baker*, 962 F.3d at 947, as the Court here should similarly do. The Seventh Circuit reasoned that, notwithstanding the plaintiffs' disavowal of any claims based on the defendants' actions taken pursuant to federal contracts, the plaintiffs' allegations of injury posed "a difficult causation question" involving whether the alleged injuries arose from products manufactured for the government "that a *federal court* should be the one to resolve." *Id*. at 945 & n.3 (emphasis added).

Similarly, the State's purported disavowal here poses "a difficult causation question" involving whether the claimed injury arose from activity that can be separated between the portion of McKesson's distribution of prescription opioids

40

that was federal-directed activity and the portion that was not.  As *Baker* holds, that question should be resolved on the merits by the federal court, not at the removal stage, consistent with the purpose of the federal officer removal statue.  *See Acker*, 527 U.S. at 432 ("To choose between those readings of the Ordinance is to decide the merits of this case . . . Accordingly, we credit the [defendants'] theory of the case for purposes of both [the causal nexus and colorable federal defense] elements of our jurisdictional inquiry"); *Willingham*, 395 U.S. at 409 (removing defendants have "sufficiently put in issue the questions of official justification and immunity; the validity of their defenses should be determined in the federal courts").

### C.  McKesson Has Colorable Federal Defenses to the State's Claims.

The federal defense requirement for federal office removal "is satisfied in 'all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law.'"  *Isaacson*, 517 F.3d at 139 (citation omitted); *Sawyer*, 860 F.3d at 257 ("the [federal] defense need only apply to one claim to remove the case"). "Proof of a colorable federal defense . . . does not require the defendant to 'win his case before he can have it removed' nor even establish that the defense is 'clearly sustainable.'"  *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 210 (4th Cir. 2016) (citing *Willingham*, 395 U.S. at 407).  "[A]n asserted federal defense is colorable unless it is immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous."  *Latiolais*, 951 F.3d at 297.

The district court erred in concluding that McKesson had no colorable federal defenses to the State's claims. McKesson has a colorable federal government contractor defense because a substantial portion of its opioid distributions in Oklahoma were made according to the specifications of the federal PPV Contract, which required it to distribute the amount required by the federal government. *See Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). McKesson also has a colorable federal preemption defense that the State's claims are preempted by the federal statutory and regulatory framework related to the Controlled Substances Act.

### 1. McKesson Raised a Colorable Federal Government Contractor Defense.

As this Court has recognized, the government contractor defense applies to civilian contractors providing services in the healthcare context. *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1098 (10th Cir. 2015) (recognizing government contractor defense for insurance carrier administering health plan for federal employees); *see also Boyle*, 487 U.S. at 506 (acknowledging that "[t]he federal interest" in preempting state law duties contrary to federal policy "surely exists as much in procurement contracts *as in performance contracts*") (emphasis added). Other federal appellate courts likewise have recognized that the government contractor defense applies to service contracts in the civilian domain. *See, e.g.*, *Bennett*, 607 F.3d at 1088-89 (company performing mold remediation for Federal Aviation Administration alleged colorable government contractor defense).

Under the government contractor defense, federal common law preempts and displaces state law that "creates a significant conflict with federal policy or interests" embodied in the terms of a federal contract. *Helfrich*, 804 F.3d at 1097 (citing *Boyle*, 487 U.S. at 509). Here, the unique terms of the federal PPV Contract reflect the premium that the federal government placed on ensuring a reliable and readily accessible supply chain of prescription medications for the VA and other federal healthcare providers purchasing under that Contract. *Supra* at pp. 24-27. In particular, the PPV Contract is premised on the federal policy of vesting the Contracting Officer with authority to determine whether shipments should be halted or purchasers suspended from eligibility. *Id*. at 27-28. Imposing civil liability based on the State's theory that McKesson should have refused to ship orders based on its assessment of possible diversion to illegal channels of distribution or use, Aplt. App. Vol. 1 at 43, 46, 49, or that McKesson shipped an allegedly excessive amount of prescription opioids even though the federal government ordered them, *id*. at 49, would conflict with that federal policy and would disrupt that federal supply chain, thereby undermining the interests of the federal government. Thus, displacement of Oklahoma law is necessary to preserve the "uniquely federal' interest" here in the "provision of affordable quality healthcare." *Helfrich*, 804 F.3d at 1098.

McKesson can allege each element of the government contractor defense. *First*, the government "approved reasonably precise specifications" through the

federal PPV Contract as to how McKesson was to distribute prescription medications, including opioids, to federal healthcare providers. *Helfrich*, 804 F.3d at 1095 (citing *Boyle*, 487 U.S. at 512). Nearly every aspect of McKesson's distribution of prescription medications, including the procedures limiting McKesson's ability to unilaterally not distribute any particular orders, are monitored by the VA and must conform to the VA's requirements. *Supra* pp. at 24-27. Under the federal PPV Contract, McKesson could not unreasonably delay federal orders or refuse orders under the Contract unless authorized by a federal Contracting Officer. *Id*. at 26-27. These provisions, which are set by the VA and enforced by a federal Contracting Officer, "capture the government's discretion in the design" of a program intended to ensure the prompt and consistent delivery of needed medications to federal healthcare facilities. *Ruppel*, 701 F.3d at 1183-84. The provisions of the Contract thus "make colorable that the government approved reasonably precise specifications" about whether, when, and in what amount and frequency McKesson must distribute orders placed by federal healthcare facilities. *Latiolais*, 951 F.3d at 297.

*Second*, McKesson's deliveries have "conformed to th[e] specifications" imposed by the federal PPV Contract, as the orders would not have been accepted if they were not in compliance. *Helfrich*, 804 F.3d. at 1095; *see* Aplt. App. Vol. 1 at 137 ("All items ordered shall be provided to the ordering facilities in accordance

with the terms and conditions of the PPV Contract"); *id*. at 196 ("The Contractor shall only tender for acceptance those items that conform to the requirements of this contract . . . The Government may require repair or replacement of nonconforming supplies or re-performance of nonconforming services at no increase in contract price."). Failing to distribute orders in the volume demanded by federal healthcare entities could have led the government to terminate some or all of the Contract. *Id*. at 200 ("The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance."); *see Sawyer*, 860 F.3d at 256 (second prong of government contractor defense in asbestos failure-to-warn case satisfied where "affidavit describe[ed] rigorous inspection process" for equipment intended for installation onto Navy vessels, and "indicat[ed] that the Navy would notice and penalize any deviation").

*Third*, the government was "aware of all the dangers of which [McKesson] w[as] aware." *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1156 (6th Cir. 1995); *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1487 (5th Cir. 1989) ("After *Boyle* a government contractor is only responsible for warning the government of dangers about which it has actual knowledge."); *accord Ruppel*, 701 F.3d at 1185. Here, as reflected by the DEA data on which the State relies in its Petition, the federal

government was well-informed of whatever risks were posed that prescription opioids could be repurposed for unauthorized or illicit uses, and indeed had much greater information regarding any risks than McKesson had because it maintained an extensive database of prescription opioid distributions across the country (a database that the State relies on in its Petition).

The language in the federal PPV Contract requiring compliance with applicable federal and state laws does *not* preclude the assertion of a federal contractor defense. Aplt. App. Vol. 1 at 201. Although McKesson did not act contrary to federal or state law, the State contends that McKesson should have refused to ship some undefined portion of its opioid orders, including those ordered by the federal government, under a Contract that does not grant McKesson discretion to do so. The State's novel reading of Oklahoma law runs counter to the provisions of the Contract that prohibit McKesson from "unreasonably delay" in filling a federal order, or from suspending a purchaser's eligibility under the Contract, except on the written instruction of the Contracting Officer. Aplt. App. Vol. 1 at 204.

Where, as here, "the federal defense [is] an issue of first impression" and "ha[s] previously found success in other circuits, one would be hard pressed to say that the defense was not colorable." *City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 391 (6th Cir. 2007); *see In re Nat. Prescription Opiate Litig.*, 327 F.Supp.3d at 1078 ("McKesson's distributions to the federal

government pursuant to the PPV Contract are sufficient to demonstrate that the government contractor defense is plausible."). McKesson's government contractor defense is – at a minimum – "plausible" or "colorable," and therefore easily satisfies this "lenient" standard. *Caver*, 845 F.3d at 1146.

### 2. McKesson Raised a Colorable Federal Preemption Defense.

McKesson has a colorable preemption defense on the grounds that the State's claims under Oklahoma law conflict with and are thus preempted by the federal statutory and regulatory framework related to the CSA. Notably, the State's claims "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in designing a nationwide regulatory scheme for controlled substances and federally registered participants. *Colorado Dep't of Pub. Health & Env't, Hazardous Materials & Waste Mgmt. Div. v. United States*, 693 F.3d 1214, 1223 (10th Cir. 2012) *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 707 (4th Cir. 2015). Furthermore, the state law standard of care for which the State seeks to hold McKesson liable conflicts with the standard set by the federal CSA, making "it . . . impossible" for McKesson "to comply with both state and federal requirements . . . ." *Colorado Dep't of Pub. Health*, 693 F.3d at 1223. The district court erred in rejecting McKesson's federal preemption defense.

The State premises its claims on the argument that McKesson should have prevented an alleged oversupply of opioids from being distributed in Oklahoma by

refusing to ship some portion of the orders received from healthcare providers and pharmacies. Aplt. App. Vol. 1 at 37 (alleging that McKesson failed to "halt shipments of opioids in quantities it knew or should have known could not be justified and were indicative of serious oversupply of opioids"). As the State contends, McKesson's failure to halt these allegedly suspicious opioid shipments and "control the supply" of opioids flowing into Oklahoma violated "a dut[y] to use reasonable care" under Oklahoma and common law. *Id*. at 39.

However, the State's proposed standard of reasonable care is inconsistent with the "purpose and intended effects" of the federal regulatory regime for controlled substances. *See Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000). In enacting the CSA to "control the supply and demand of controlled substances," Congress intended both "to foster the beneficial use of those medications" *and* "to prevent their misuse[.]" *Gonzalez v. Raich*, 545 U.S. 1, 19, 24 (2005); *see also* Dispensing Controlled Substances for the Treatment of Pain, 71 Fed. Reg. 52,716, 52,719-20 (DEA Sept. 6, 2006) (DEA has "obligation to ensure that there is no interference with the dispensing of controlled substances to the American public in accordance with the sound medical judgment of their physicians."). But in arguing that McKesson should have halted "many of the[] shipments" of opioids that were ordered by health care providers in order to prevent an alleged oversupply in Oklahoma, Aplt. App. Vol. 1 at 43, the State advances a theory of liability based on

the assumption that "the [fewer opioids], and the sooner, the better." *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 874-75 (2000) (plaintiff's attempt to impose liability on car manufacturer based on a theory that "the more airbags, and the sooner, the better" conflicted with the objectives of the Department of Transportation to promote "a mix of different devices introduced gradually over time," and were thus preempted). The State's simplistic approach would interfere with DEA's ability to regulate under and enforce the CSA in accordance with the risks and benefits of the distribution of opioids, as Congress mandated.

Moreover, to the extent that the State's theory of what constitutes "reasonable" conduct in distributing prescription opioids is inconsistent with the standard set by the CSA, McKesson would be unable to comply with both federal and Oklahoma law. For example, if Oklahoma law prohibits the distribution of controlled substances authorized by DEA, McKesson would not be able to simultaneously comply with state law and fulfill its responsibility to fill orders as DEA expects it to do as part of DEA's regulation of the nationwide supply of needed medicines. Even if the State seeks to employ Oklahoma law to impose penalties only for actions that it claims are prohibited by federal regulation – an argument based on a fundamental misinterpretation of the federal provisions regarding DEA's considerations for federal registration – imposing a greater remedy than DEA imposes still creates a conflict: "[I]t does not follow that the state and federal authorities may supplement

each other ....The conflict lies in remedies, not rights .... [W]hen two separate remedies are brought to bear on the same activity, a conflict is imminent." *Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776*, 346 U.S. 485, 498–99 (1953). At this stage, the possibility that a state court might impose a greater remedy than authorized by DEA, or otherwise rule inconsistently with the federal statutory and regulatory framework related to the CSA, is more than enough to establish the preemption defense.

The federal officer removal statute "is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Willingham*, 395 U.S. at 406-07. Because McKesson has made more than a reasonable showing that the government contractor and preemption defenses apply to the State's claims, *Ruppel*, 701 F.3d at 1182, McKesson "should have the opportunity to present [its] version of the facts to a federal, not a state, court." *Willingham*, 395 U.S. at 409.

## CONCLUSION

For the reasons set forth above, the district court's order granting the State's motion to remand should be reversed.

November 18, 2020

/s/ Stuart D. Campbell
Stuart D. Campbell
DOERNER, SAUNDERS, DANIEL
& ANDERSON, L.L.P.

700 Williams Center Tower II
Two West Second Street
Tulsa, Oklahoma 74103-3522
Telephone: 918-582-1211
scampbell@dsda.com

Kaylee Davis-Maddy
DOERNER, SAUNDERS, DANIEL
& ANDERSON, L.L.P.
210 Park Avenue, Suite 1200
Oklahoma City, OK 73102
Telephone: 405-319-3513
kmaddy@dsda.com

Beth S. Brinkmann
Timothy C. Hester
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: 202-662-6000
bbrinkmann@cov.com
thester@cov.com

Raymond G. Lu
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: 424-332-4800
rlu@cov.com

*Counsel for McKesson Corporation*

# REMAND ORDER OF DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

|  |  |
|---|---|
| STATE OF OKLAHOMA, ex rel., <br> Mike Hunter, Attorney General of Oklahoma, <br><br>     Plaintiff, <br><br> v. <br><br> McKESSON CORPORATION, <br><br>     Defendant. | Case No. CIV-20-172-RAW |

**ORDER**[*]

Before the court is the State's motion to remand [Docket No. 6].  The State filed this

action against the McKesson Corporation (hereinafter "McKesson") in the District Court of

Bryan County Oklahoma, alleging state law claims of negligence, public nuisance pursuant to 50

OKLA. STAT. § 2, and unjust enrichment, all related to McKesson's distribution of opioids in

Oklahoma.  In its Petition, the State explicitly disavowed any and all federal claims related to

McKesson's opioid distributions, including distributions made "to federal customers under the

authority or direction of a federal officer, federal agency, or pursuant to a federal contract

including but not limited to any Pharmaceutical Prime Vendor Contract."  *Docket No. 2-3,* at 37.

Nevertheless, McKesson filed a notice of removal pursuant to the federal officer removal

statute, 28 U.S.C. § 1442, arguing this case is removable because the State's allegations relate to

and necessarily implicate McKesson's distribution of opioids "to federal facilities throughout

Oklahoma under the requirements of a federal contract and under the direction of a federal

---

[*] For clarity and consistency herein, when the court cites to the record, it uses the pagination
assigned by CM/ECF.

officer." *Docket No. 2*, at 1.  McKesson distributes pharmaceuticals to federal customers such as

the Department of Veterans Affairs, Indian Health Services, and the Bureau of Prisons in

Oklahoma under a federal Pharmaceutical Prime Vendor Contract (hereinafter "PPV Contract").

*Id*. at 2-3.  McKesson argues that the State's public nuisance claim based on alleged excessive

opioid distributions cannot be separated by opioids distributed in Oklahoma under the PPV

Contract and other opioids distributed in Oklahoma.  *Id*. at 1, 4, and 13.

In fact, however, in its response to the motion to remand, McKesson informs the State

and the court that from January 1, 2006 through October 31, 2019, the opioid distributions to

federal PPV Contract facilities in Oklahoma accounted for approximately 17.1 percent of

McKesson's total opioid distributions to Oklahoma.  *Docket No. 17-2*, at 2-3.  In its reply, the

State acknowledges that it has the burden to prove its state law claims and confirms that it

intends to prove its state law claims based solely on the remaining 82.9 percent of distributions

in Oklahoma.

The federal officer removal statute authorizes removal here if McKesson shows that: "(1)

that it acted under the direction of a federal officer; (2) that there is a causal nexus between the

[State's] claims and the acts [McKesson] performed under the federal officer's direction; and (3)

that there is a colorable federal defense to the [State's] claims."  *Greene v. Citigroup, Inc*. 215

F.3d 1336, 2000 WL 647190, at *2 (10th Cir. 2000).

The court agrees with the State that McKesson has failed to demonstrate any of the

elements of federal officer removal.  The State pleaded state law causes of action based on non-

PPV Contract opioid distributions.  As argued by the State, these distributions were not made

under the direction of a federal officer.  There also is no causal nexus between the State's claims

and any acts McKesson performed under a federal officer's direction.  Finally, McKesson does

2

not have a colorable federal defense to the State's claims.  As the State has disavowed any federal claims, McKesson's government contractor defense fails.  Further, McKesson is incorrect in its argument that the State's claims are preempted by the Federal Controlled Substances Act; thus, its federal preemption defense also fails.  *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 4178591, at *28-29 (N.D. Ohio Sep. 3, 2019).  The motion to remand is hereby granted.

### *Attorney Fees*

The State requests attorney fees and costs incurred as a result of McKesson's improper removal.  The court has discretion to award just costs and actual expenses, including attorney fees, upon remand.  28 U.S.C. § 1447(c).  An award of costs and fees is proper under § 1447(c) "only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005).  While it seems clear removal was improper, the court does not find that McKesson lacked any objective reasonable basis for seeking removal.  In its discretion, therefore, the court declines to award fees and costs.

### *Conclusion*

The State's motion to remand [Docket No. 6] is GRANTED.  This action is hereby remanded to the District Court of Bryan County Oklahoma.  McKesson's requests that the court stay its order pending appeal is DENIED.  The State's request for attorney fees is also DENIED.

**IT IS SO ORDERED** this 14th day of September, 2020.

_____
**THE HONORABLE RONALD A. WHITE**
**UNITED STATES DISTRICT JUDGE**
**EASTERN DISTRICT OF OKLAHOMA**

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant McKesson Corporation respectfully submits that oral argument would be helpful to the disposition of this appeal. This case presents important questions regarding the proper application of the federal statute that governs removal to federal court of a case by a defendant acting under a federal officer when distributing prescription medications to federal healthcare entities.

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE
## AND WORD COUNT LIMITS

I certify that this brief complies with the type-face and volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(7) as follows: the type face is Times New Roman, proportionally spaced, fourteen-point font, and the number of words in this brief is 11,510, which is within the Rule's limitation of 13,000.


November 18, 2020                    /s/  Stuart D. Campbell
                                     Stuart D. Campbell

## CERTIFICATION OF DIGITAL SUBMISSION, PRIVACY REDACTION, AND ANTIVIRUS SCAN

I hereby certify that the foregoing, as submitted electronically through this Court's CM/ECF system, is an exact copy of the written copy filed with the Clerk. I also certify that all required privacy redactions have been made. Additionally, I certify that the electronically submitted version was scanned for viruses with Cortex XDR Agent (version 7.1.2, last updated on November 10, 2020), a commercial virus scanning program and, according to the program, is free of viruses.

November 18, 2020

/s/ Stuart D. Campbell
Stuart D. Campbell

## CERTIFICATE OF SERVICE

I, Stuart D. Campbell, counsel for Defendant-Appellant McKesson Corporation, hereby certify that a true and correct copy of the foregoing was electronically filed using the CM/ECF system on November 18, 2020, and served upon all those participating therein.

*/s/*   Stuart D. Campbell
Stuart D. Campbell